UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X

POWER UP LENDING GROUP, LTD.,

                              Plaintiff,

          -against-

PARALLAX HEALTH SCIENCES, INC., and
PAUL R. ARENA,

                            Defendants.
------------------------------------------------------------X

For Online Publication Only

**ORDER**
20-CV-3259 (JMA) (AYS)

FILED
CLERK
3:04 pm, Apr 19, 2023
U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

**AZRACK, United States District Judge:**

      Plaintiff Power Up Lending Group, LTD. ("Plaintiff" or "Power Up") brought this action against Defendants Parallax Health Sciences, Inc. ("Parallax") and Paul R. Arena ("Arena") arising out of Parallax's breach of two convertible promissory notes.  Plaintiff alleges that Arena, who was Parallax's CEO, tortiously interfered with those notes, causing Parallax to breach its obligations to Plaintiff.  Currently pending before the Court is Plaintiff's motion for a default judgment against Arena.  For the reasons stated below, that motion is GRANTED in part and DENIED in part.

## I.  BACKGROUND

### A.  Factual Background Based on the Complaint

      As discussed infra, because of Arena's default, all the relevant factual allegations from the Complaint—which are set out below—are deemed admitted.

      Arena was the Chief Executive Officer of Parallax.  (Compl. ¶ 3.)  He had "total and unfettered control of" Parallax's "business, legal and financial affairs."  (Id. ¶ 4.)  Arena's

compensation included a substantial number of stock options.[1]  (Parallax 10-K at 69, ECF No. 36-9.)

In December 2019 and January 2020, Power Up and Parallax entered into two Convertible Promissory Notes (the "Notes") and related Securities Purchase Agreements.[2]  In the first Note, dated December 4, 2019, Power Up loaned Parallax $83,000 (the "Dec. 4. Note").  (Compl. ¶ 6.) In the second Note, dated January 22, 2020, Power Up loaned Parallax an additional $78,000 (the "Jan. 22 Note").  (Id. ¶ 7; Kramer Decl. ¶ 5.)  The relevant provisions of the Notes discussed below are the same.

Arena signed these agreements on behalf of Parallax but did not personally guarantee either Note.  The Notes granted Power Up the right to convert all or part of the outstanding and unpaid principal on the loans into shares of Parallax's common stock.  (Dec. 4 Note ¶ 10.)  Parallax had the ability to pre-pay the Notes under certain conditions within 180 days of issuance.  (Id. ¶ 1.7.) However, after 180 days, Power Up had the right to exercise the conversion option in the Notes. (Id. ¶ 1.4.)  Power Up's conversion rights allowed it to convert the principal amount of the loan and any accrued interest into shares of Parallax on the following terms.  (Id. ¶ 1.1.)  Power Up could exercise this conversion right at the lesser of $0.12 per share or the "Variable Conversion Price," which was the "Market Price" of the shares minus a 35% discount.  (Id. ¶ 1.2.)  The Market Price was based on the average of the three lowest share prices during the fifteen-day period before the conversion.  (Id.)  After exercising its conversion rights, Power Up would then sell those shares to third parties, which could create downward pressure on Parallax's stock price.

---

[1]  The Court takes judicial notice of this document.  Additionally, the Court notes that Arena signed this document and does not object to the Court's consideration of this document or dispute its contents.

[2]  Both the Notes and the accompanying Securities Purchases Agreements are incorporated by reference into the Complaint.

The Complaint explains the purposes and value of Power Up's conversion rights in the Notes:

> The purpose of the [conversion provisions in the Notes] is to ensure that the [Power Up] will be able to convert debt into stock of [Parallax] and will then be able to sell that stock on the open market, as it is well known to both parties and the investment community in general that companies such as [Parallax] are not expected to pay these obligations as they generally do not have the cash or other resources to do so and instead all parties expect and agree that payment shall be made by the conversion process, such that it is the acquisition of free trading stock that is the purpose of the transaction and without which the transaction is valueless and would never be entered into by the Plaintiff.

(Compl. ¶ 39.)

The Notes included safeguards to protect Power Up in the event that Power Up exercised its conversion rights and Parallax sought to avoid the conversion request.  (2019 Note ¶¶ 1.3, 3.12; 2019 Securities Purchase Agreement ¶ 5.)  The Notes required Parallax to use a transfer agent who was:  (1) bound by irrevocable instructions to effectuate the conversions, and (2) required to hold a reserve of Parallax shares that would be provided to Power Up without necessitating any further action by Parallax.  (Id.) The Notes provided that Power Up could declare the Notes in default if Parallax did not abide by these requirements concerning the transfer agent.[3]   (2019 Note ¶¶ 1.3, 3.12.)

---

[3]  One of relevant provisions states:

> In the event that [Parallax] proposes to replace its transfer agent, [Parallax] fails to provide, prior to the effective date of such replacement, a fully executed irrevocable Transfer Agent Instructions in a form as initially delivered pursuant to the Purchase Agreement (including but not limited to the provision to irrevocably reserve shares of Common Stock in the Reserved Amount) signed by the successor transfer agent to Borrower and the Borrower.

(Id. ¶ 3.12.)

The Notes also recount other events that would constitute a default, including the delisting of Parallax's stock.  (Id. ¶ 3.7 (stating that an event of default occurs if Parallax "fails [to] maintain the listing of the Common Stock on [a qualifying exchange]").)

On April 10, 2020, Power Up "discovered that Parallax replaced Action Stock Transfer Corporation as its transfer agent with ClearTrust, LLC and failed to provide a fully executed irrevocable transfer agent instruction letter to PowerUp."  (Apr. 20, 2020 Ltr., ECF No. 36-8.)

On April 13, 2020, the Securities and Exchange Commission ("SEC") announced the temporary suspension of trading in Parallax's stock pursuant to Section 12(k) of the Securities Exchange Act of 1934.  (Id.)  Due to this suspension in trading, Parallax failed to maintain the listing of its common stock on a qualified exchange, as required under the Notes.  (Id.)  This temporary suspension began on April 13, 2020 and ran through April 24, 2020.  (Id.)  The SEC's April 13 press release—which is incorporated by reference into the Complaint—states:

> The Commission temporarily suspended trading in the securities of Parallax because of questions that have been raised about the accuracy and adequacy of information in the marketplace relating to Parallax common stock, including questions relating to statements Parallax made on its website and in press releases on March 12, March 16, March 17, March 23 and March 24, 2020 about its purported development of a rapid screening test for COVID-19 and its purported access to large quantities of COVID-19 diagnostic testing kits and personal protective equipment.

(SEC Press Release, ECF No. 36-10.)

On April 14, 2020, Power Up sent Parallax a notice declaring that Parallax was in default due to the trading suspension and Parallax's changes to the transfer agent.  (Apr. 20, 2020 Ltr.)  Power Up demanded immediate payment of $322,000 due under the Notes along with accrued interest and default interest.  (Id.; Compl. ¶ 18.)

In support of Plaintiff's claim for tortious interference against Arena, the Complaint also alleges the following:

46. That at all times relevant herein, [Arena] was fully and completely aware of the existence of the Notes and Agreements and the terms thereof, having actually negotiated the Notes and Agreements with the [Plaintiff and having executed them as well as becoming fully familiar with their terms and provisions and the Plaintiffs rights thereunder.

47. That [Arena], deliberately and purposefully caused [Parallax] to breach the terms and provisions of the Notes and Agreements in the manner and circumstances described above, and did so beyond the scope of his duties as an officer of [Parallax] and further caused such breaches to take place for his own financial and economic benefit, and not for the benefit of [Parallax].

48. That the Notes and Agreements were in fact breached through the actions of [Arena] with full knowledge of the existence and terms of the Notes and Agreements for the purpose of benefiting [Arena] and not for any proper corporate purposes, thus causing damage to the Plaintiff.

(Compl. ¶¶ 46–48.)

The Complaint contain two other allegations concerning damages.  The Complaint alleges that Parallax's defaults under the Notes have left the Notes "valueless to" Power Up.  (Compl. ¶ 20.)  The Complaint also alleges that, "as a direct result of the defaults of [Parallax] and its failure to abide by its contractual obligations [Power Up] has been deprived of, and continues to be deprived of, the opportunity to acquire and dispose of the common stock of [Parallax] which profits are irretrievably lost because the markets for the common stock can no longer be recreated."  (Id. ¶ 31.)

## B.  **Procedural History**

Plaintiff originally filed this action in New York state court on June 19, 2020.  On July 21, 2020, Defendants removed the action to this Court.  On August 14, 2020, Defendants filed a pre-motion conference letter requesting permission to file a motion to dismiss the tortious interference claim against Arena and three of the claims against Parallax.  On October 1, 2020, Plaintiff filed a pre-motion letter seeking leave to move for a default judgment.  Plaintiff took the position that

Defendants should be considered in default because they filed their pre-motion conference letter for their proposed motion to dismiss after their deadline to file an answer had already passed.

On October 7, 2020, counsel for Defendants filed a motion to withdraw.  On November 4, 2020, Magistrate Judge Shields granted the motion to withdraw.  Judge Shields also stayed the case for 60 days to allow Defendants to obtain new counsel or, in Arena's case, to elect to proceed pro se.

After Parallax failed to obtain counsel, Plaintiff filed letters renewing its request for permission to move for a default judgment against both Defendants.  On April 16, 2021, Plaintiff's counsel and Arena appeared before the Court for a pre-motion conference.  The Court granted Plaintiff leave to file a motion for default judgment against Parallax within 30 days and set a briefing schedule for Arena's proposed motion to dismiss.  Arena was supposed to file his motion by May 17, 2021, and the briefing was supposed to be completed by July 17, 2021.  The Court also informed Arena of his obligation to provide the Court with a current address and contact information and warned him that failure to provide this information to the Court could result in entry of a default judgment against him.

On April 23, 2021, Plaintiff moved for default judgment against Parallax.

On May 14, 2021, Arena requested an additional "60-90 days" to obtain financing and counsel.  In a letter dated June 3, 2021, Plaintiff opposed Arena's request for an extension of time. The Court did not grant Arena's request for an extension of time, and Arena never filed a motion to dismiss.

On July 8, 2021, Plaintiff filed a letter noting that Arena had not filed his motion to dismiss by the Court-ordered deadline.   Plaintiff's letter also informed the Court that the SEC had sued Arena and Parallax for securities fraud in connection with press releases Parallax had issued in

March and April 2020 (the "SEC Action").  The SEC Action alleged that these press releases made several false representations about a COVID-19 test Parallax was purportedly developing and personal protective equipment that it was offering for sale.  Later in July 2021, the Court received a letter from Parallax's Chief Financial Officer enclosing Consent Judgments that Arena and Parallax had entered into with the SEC to the resolve the SEC Action.  While Arena did not "admit" or "deny" the factual allegations in the SEC's complaint, he agreed to pay a $45,000 civil penalty and to the imposition of various forms of injunctive relief.  Parallax agreed to, <u>inter alia</u>, pay a $100,000 civil penalty.[4]

On August 24, 2021, Plaintiff filed a pre-motion conference letter requesting leave to file a motion for default judgment against Arena, who never filed an answer.

On March 31, 2022, the Court granted Plaintiff's motion for default judgment against Parallax on the issue of liability but deferred ruling on the calculation of damages pending resolution of the claim against Arena.  The Court's Order noted Arena's failure to file any motion to dismiss, granted Plaintiff leave to file a motion for default judgment against Arena, and set a briefing schedule for the motion.  On May 2, 2022, the Clerk, acting on Plaintiff's request, docketed an Entry of Default against Arena based on his failure to appear and defend this action.  On May 31, 2022, counsel appeared for Arena and served an opposition brief on his behalf.  On June 14, 2022, the fully-briefed motion for default judgment was filed.

Arena has not moved to vacate the entry of default against him.  Instead, he has opposed the motion for default judgment on a single ground—namely, that the factual allegations in the Complaint fail to state a claim for tortious interference.

---

[4] Because the allegations in the SEC's Complaint are not alleged in Plaintiff's Complaint, the Court does not deem those allegations to have been admitted.

## II. DISCUSSION

### A.  Standard for Motions for Default Judgment

When a defendant defaults, the Court accepts all of the factual allegations in the Complaint "as true and draw[s] all reasonable inferences in its favor."  Finkel v. Romanowicz, 577 F.3d 79, 84 (2d Cir. 2009).  The factual allegations in a complaint are sufficient to establish a defendant's liability for a default judgment if those factual allegations state a plausible claim under the "plausibility" standard set out in Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  See Cont'l Indus. Grp., Inc. v. Altunkilic, 788 F. App'x 37, 41 (2d Cir. 2019); TAGC Mgmt., LLC v. Lehman, Lee & Xu Ltd., 536 F. App'x 45, 47 (2d Cir. 2013).

The Court notes that Arena's opposition papers include an affidavit from Arena setting out certain facts that are not contained in the Complaint.  The Court will not consider that affidavit given the procedural posture of this motion.  The sole question before the Court is the sufficiency of the allegations in Plaintiff's Complaint, which have been deemed admitted as a result of Arena's default.  Notably, the Court's consideration of Arena's affidavit is not even consistent with Arena's own framing of this motion.  According to Arena, "[t]his motion presents one issue for decision: Did Plaintiff state well-pleaded facts sufficient to permit entry of default judgment against Mr. Arena in his individual capacity?"  (Pl. Mem. at 1.)

### B.  Standard for Tortious Interference

To establish tortious interference with a contract under New York law, a plaintiff must show:  "the existence of a valid contract between the plaintiff and a third party, defendant's knowledge of that contract, defendant's intentional procurement of the third-party's breach of the contract without justification, actual breach of the contract, and damages resulting therefrom."

Lama Holding Co. v. Smith Barney Inc., 88 N.Y.2d 413, 424 (1996); see also White Plains Coat & Apron Co. v. Cintas Corp., 8 N.Y.3d 422, 426 (2007).

"In New York, officers, directors or employees of a corporation cannot be personally liable for inducing the corporation to breach a contract with a third party if they act on behalf of the corporation and within the scope of their duties." Vis Vires Grp., Inc. v. Endonovo Therapeutics, Inc., No. 16-CV-470, 2016 WL 6238528, at *10 (E.D.N.Y. Oct. 24, 2016) (citation omitted). "Personal liability will be imposed only if the plaintiff shows that the officer or employee acted outside the scope of his employment by committing an independent tort or by pursuing a personal interest." Id. (citation omitted).

**C.  Arena's Arguments**

Arena argues that the Complaint's factual allegations are, generally, too conclusory to plausibly allege tortious interference.   Arena also asserts that there are insufficient factual allegations to establish that:  (1) he was pursuing a personal interest and engaged in wrongful means; (2) there was no justification for the breaches; (3) he intentionally procured Parallax's breach based on the delisting of Parallax's stock; and (4) the breach of the transfer agent provisions caused any damages.  On the final point, Arena asserts that the trading suspension—and not the breach of transfer agent provisions—caused Plaintiff's purported damages, which all stem from being unable to exercise its conversion rights and sell shares of stock to third parties.

**D.  Parallax's Breach of the Notes' Listing Requirement**

**1.  Parties' Arguments**

Plaintiff claims that Arena committed tortious interference by "intentionally causing [Parallax's] stock to be delisted," thus breaching the Notes' de-listing provisions.  (Pl. Mem. at 5, ECF No. 36-14.)  Specifically, Plaintiff argues that Arena procured this breach by "putting out

false and fraudulent press releases to pump the value of the stock up for his own personal benefit." (Id. at 6.)

Arena contends that Plaintiff's conclusory factual allegations on this point are not plausible and that "there are not well-pleaded facts showing intent." (Arena Mem. at 11–12, ECF No. 36-15.) Arena asserts that "as a matter of logic, the act of allegedly pumping up the price of the stock could not logically be viewed as intending to induce Parallax to breach its contract." (Id. at 11.) Arena also maintains that Plaintiff's arguments are contradictory and illogical as he "could not intentionally try to cause the stock to be delisted while [at the same time] trying to pump up the value of the stock" in order to "gain a personal benefit." (Id. at 9.)

**2. Standard for "Intentional Inducement"**

To state a tortious interference claim, a plaintiff must allege "intentional inducement." Kronos, Inc. v. AVX Corp., 81 N.Y.2d 90, 94, 612 N.E.2d 289 (1993); see Lama Holding, 88 N.Y.2d at 413 (plaintiff must establish "defendant's intentional procurement of the third-party's breach of the contract") (emphasis added); B & M Linen, Corp. v. Kannegiesser, USA, Corp., 679 F. Supp. 2d 474, 485 (S.D.N.Y. 2010) ("[A] complaint must allege that the defendant intended to interfere with the plaintiff's business or contractual relations with another party." (emphasis in original)).

As explained below, even if a defendant does not subjectively intend to cause the third-party's breach, the defendant can still potentially be liable for tortious interference if he is "certain" or "substantially certain" that his actions will cause the breach.

Plaintiff's opening brief cites two federal district court cases which state that a defendant commits tortious interference when, inter alia, he "commits an intentional act whose probable foreseeable outcome is that one party will breach the contract." Union Cent. Life Ins. Co. v.

Berger, No. 10 CIV. 8408, 2012 WL 4217795, at *14 (S.D.N.Y. Sept. 20, 2012), aff'd, 612 F. App'x 47 (2d Cir. 2015) (quoting Leventhal v. Franzus Co., Inc., No. 88 CIV. 3547, 1988 WL 132868, at *1 (S.D.N.Y. Dec. 6, 1988) (emphasis added)).  Plaintiff—which does little to develop this argument in its reply brief—seems to imply that, in order to state a claim for tortious interference against Arena, it is sufficient to establish that Arena knew that the "probable foreseeable result" of his statements in the press releases would be the trading suspension and breach of the Notes' listing requirement.

The Court is not persuaded that this is the appropriate standard under New York law.  No New York state court decisions cite the "probable foreseeable outcome" standard, and the federal district court decisions that mention it do so only in dicta.  Leventhal—the district court case that first articulated the "probable foreseeable outcome" standard—did so in dicta (in a discussion of a separate issue) and appears to mischaracterize Campbell v. Gates, 236 N.Y. 457, 141 N.E. 914 (1923), the single New York Court of Appeals decision that Leventhal cites for this proposition. See Gates, 236 N.Y. at 460 (holding—without any mention of the terms "probable" or "foreseeable"—that "actual malice" or "ill will" is not required for a tortious interference claim).

New York law does not include a "probable foreseeable outcome" test for the "intent" element of a tortious interference claim.  However, other more persuasive authorities—including the Restatement and cases citing the Restatement—indicate that, even if a defendant does subjectively intend to cause the breach, a plaintiff might still be able to establish tortious interference by showing that the defendant committed an intentional act that he knew was "certain" or "substantially certain" to cause the breach.

As the Restatement (Second) of Torts explains:

j. Intent and purpose.  The rule stated in this Section is applicable if the actor acts for the primary purpose of interfering with the performance of the contract, and also if he desires to interfere, even though he acts for some other purpose in addition. <u>The rule is broader, however, in its application than to cases in which the defendant has acted with this purpose or desire.</u>  It applies also to intentional interference, as that term is defined in § 8A, <u>in which the actor does not act for the purpose of interfering with the contract or desire it but knows that the interference is certain or substantially certain to occur as a result of his action</u>.  The rule applies, in other words, to an interference that is incidental to the actor's independent purpose and desire but known to him to be a <u>necessary consequence</u> of his action.

The fact that this interference with the other's contract was not desired and was purely incidental in character is, however, a factor to be considered in determining whether the interference is improper.  If the actor is not acting criminally nor with fraud or violence or other means wrongful in themselves but is endeavoring to advance some interest of his own, the fact that he is aware that he will cause interference with the plaintiff's contract may be regarded as such a minor and incidental consequence and so far removed from the defendant's objective that as against the plaintiff the interference may be found to be not improper.  (<u>See</u> § 767, especially Comment d)

Restatement (Second) of Torts § 766(j) (emphasis added).

There is precedent indicating that New York law incorporates the above principles from the Restatement.  <u>See</u> <u>Union Carbide Corp. v. Montell N.V.</u>, 944 F. Supp. 1119, 1137 (S.D.N.Y. 1996); <u>Hudson Bay Master Fund Ltd. v. Patriot Nat'l, Inc.</u>, No. 16 CIV. 2767, 2019 WL 1649983, at *14 (S.D.N.Y. Mar. 28, 2019).[5]  Assuming that New York law follows the Restatement, a plaintiff asserting a tortious interference claim must plausibly allege that the defendant knew that the interference would be "a necessary consequence of his action."

---

[5]  Some of this case law suggests there is not a material difference between the "substantial certainty" standard—for which the Restatement provides an in-depth explanation—and the "probable and foreseeable outcome" standard discussed earlier.  <u>See</u> <u>Hudson Bay</u>, 2019 WL 1649983, at *14 (stating that defendant's conduct was "sufficient interference under New York law because the 'probable and foreseeable outcome'" was that corporation would breach, but also finding that the evidence established that defendant knew "the interference [was] certain or substantially certain to occur as a result of his action.") (citing <u>Berger</u>, 2012 WL 4217795, at *14, and Restatement (Second) of Torts § 766(h)); <u>High Falls Brewing Co., LLC v. Bos. Beer Corp.</u>, 852 F. Supp. 2d 306, 312 (W.D.N.Y. 2011) (implying that the "substantial certainty" standard and the "probable and foreseeable outcome" standard are similar), <u>aff'd</u>, 513 F. App'x 12, 14 (2d Cir. 2013).

### 3. Analysis

Plaintiff's Complaint does not plausibly allege that Arena intended to cause Parallax's breach of the Notes' de-listing provision or that Arena was "certain or substantially certain" that his action would cause Parallax to breach this provision.

Plaintiff alleges that Arena "deliberately and purposefully caused [Parallax] to breach the terms and provisions of [the Notes] in the manner and circumstances described [in the Complaint]." (Compl. ¶ 47.)  This conclusory assertion—when considered in conjunction with the limited factual allegations in the Complaint—does not plausibly allege that Arena intended that for trading in Parallax's stock to be suspended and, thus, for Parallax to breach the listing requirement in the Notes.  Nor has Plaintiff plausibly alleged that Arena was "certain or substantially certain" that the statements at issue would result in the SEC suspending the trading of the stock and Parallax breaching the listing requirement.

As an initial matter, the Complaint does not squarely allege that Plaintiff "intended" for Parallax to breach the de-listing provisions in the Notes   The single conclusory allegation in the Complaint quoted above, (Compl. ¶ 47), concerns Arena's alleged purpose in taking multiple actions—related to both the delisting and the changing of the transfer agent.  The problems created by the conclusory nature of this allegation are compounded by:  (1) the limited factual allegations in the Complaint; and (2) the fact that Arena's alleged securities fraud simply makes little sense as a tortious inference claim.

The allegations in the Complaint establish the following:  (i) Arena either made (or caused to be made) the statements on Parallax's website and in press releases about "its purported development of a rapid screening test for COVID-19 and its purported access to large quantities of COVID-19 diagnostic testing kits and personal protective equipment"; (ii) that raised questions

at the SEC about the "accuracy and adequacy of" the statements sufficient to cause the SEC to temporarily suspend trading of Parallax's stock; and (iii) that suspension constituted a default under the Notes.

These allegations in the Complaint must be viewed in light of the fact that it is highly unlikely that Arena: (1) actually intended for the trading suspension to occur and for Parallax to breach the Notes by violating the listing requirement; or (2) believed that it was "certain" or "substantially certain" that the SEC would "catch" the alleged securities fraud and suspend trading of the stock—if he harbored such a belief, he would not have engaged in the alleged scheme in the first place.

The facts set out above and Plaintiff's conclusory allegation about Arena's intent, discussed above, are—when viewed together along with all reasonable inferences in favor of Plaintiff—insufficient to plausibly allege that that Arena intended for Parallax to breach the de-listing provision or knew that the SEC's suspension of trading was "certain or substantially certain to occur as a result of his action." At best, the allegations here plausibly suggest that Arena knew there was a risk that the statements at issue would result in an SEC investigation and eventual suspension of Parallax's stock (and accompanying breach of the delisting provision in the Notes). Accordingly, Plaintiff's Complaint does not plausibly allege a tortious interference claim in connection with Arena's statements and the subsequent trading suspension.

The Court notes that the facts in the SEC's complaint are not included in Plaintiff's Complaint. As such, Arena did not admit those facts by defaulting and they cannot be considered here. Plaintiff's Complaint simply mentions that the trading of Parallax's stock was suspended and incorporates the SEC's press release by reference. The Complaint does not include any specific details of Arena's statements or explicitly allege that those statements were false or that

Arena actually committed securities fraud.  While the SEC's complaint against Arena contains details about the alleged fraud, the SEC's complaint post-dates the instant Complaint and Arena's default does not constitute an admission of the allegations in the SEC's complaint.  Additionally, Arena did not admit the allegations in the SEC's complaint as part of his consent judgment with the SEC.  While Power Up could have filed an amended complaint incorporating all of the factual allegations from the SEC's complaint, it did not do so.

Given the above, the Court does not have to resolve the question of whether—if the facts in the SEC's complaint were part of the record—those facts would be sufficient to plausibly allege: (1) that Arena intended to breach the listing requirement or was "substantially certain" that his statements would result in the SEC suspending the trading in Parallax's stock; and (2) a viable tortious interference claim given all the circumstances here.  That said, the viability of such a claim seems doubtful.  The facts in the SEC's complaint plausibly allege illegal and fraudulent conduct. However, even then, the fact pattern here does not appear to fit within the elements of tortious interference or established tortious interference precedent.  Cf. Bernberg v. Health Mgmt. Sys., Inc., 303 A.D.2d 348, 756 N.Y.S.2d 96 (App. Div. 2d Dep't 2003) (finding complaint stated tortious interference claim where it alleged that defendant owners stripped corporation of all of its assets which rendered it unable to pay promissory notes and that "through [this] course of wrongful conduct, the defendants destroyed the financial well-being of [the corporation] with the intention of procuring [its] default on the notes").

For example, in contrast to the instant case, the complaint in Bernberg clearly alleged the defendants intended to procure the corporation's default on the promissory notes and the breach of the promissory notes in Bernberg appears to have been a direct, obvious, and "necessary consequence" of the defendants' actions.

Another case cited by Plaintiff is similarly distinguishable.  In Shear Enterprises, LLC v. Cohen, 189 A.D.3d 423, 424, 137 N.Y.S.3d 306 (App. Div. 1st Dep't 2020), the defendants—who knew that their business was defunct and unable to fulfill orders—still solicited orders from the plaintiff and used the money from plaintiff's down payments to reduce the defendants' personal guarantees on the business's debt.  Plaintiff suggests that Arena's conduct here was similar because Parallax could "never fulfill the obligations set forth in the fraudulent press releases."  (Pl. Reply Mem. at 5.)   However, even assuming that Arena knew that Parallax could not deliver the products discussed in the allegedly fraudulent press releases, the instant case is still not comparable to Shear Enterprises.  In Shear Enterprises, it was certain that the defendants' actions would cause the business to default on its obligations to the plaintiff.

For the reasons stated above, the Court denies Plaintiff's motion for default judgment on this aspect of its tortious interference claim.

**E.  Parallax's Breach of the Transfer Agent Provisions in the Notes**

Plaintiff also argues that Arena committed tortious interference in connection with Parallax's breach of the Notes' transfer agent provisions.  Arena's actions in changing the transfer agent—including not executing new Irrevocable Transfer Agent Instructions—breached the Notes in various respects.  The Court finds that Plaintiff's allegations concerning these actions by Arena are sufficient to plausibly allege that he committed tortious interference in connection with his actions concerning the transfer agent.  See Vis Vires Grp., Inc. v. Endonovo Therapeutics, Inc., No. 16-CV-470, 2016 WL 6238528, at *11 (E.D.N.Y. Oct. 24, 2016) (finding complaint stated plausible tortious interference claim where CEO, inter alia, removed transfer agent in violation of convertible promissory note and complaint alleged that CEO "'intentionally and with malice aforethought caused [the borrower] to breach its contractual agreements'; and that, driven by a

desire to preserve the value of his own personal assets, he acted 'for his own financial benefit, and not for the benefit of [the borrower]'"); Power Up Lending Grp., Ltd. v. All. Bioenergy Plus, Inc., No. 18-CV-3601, 2021 WL 4463921, at *10 (E.D.N.Y. Aug. 17, 2021) (finding complaint stated plausible tortious interference claim, under Virginia law, against officers of borrower for causing borrower to breach convertible promissory notes by taking similar actions involving transfer agent) (report and recommendation), adopted by, 2021 WL 4463494 (E.D.N.Y. Sept. 29, 2021).  The Court also finds that the Complaint plausibly alleges, for purposes of liability, that Arena's actions concerning the transfer agent caused some damages.  (See Compl. ¶ 48; see also id. ¶¶ 20, 31, 48.)

## F.   **Damages**

In its motion for default judgment, Plaintiff asks for $322,000 with interest, which is the amount that the Notes require Parallax to pay upon default.  Although Plaintiff has established that it is entitled to a default judgment on liability, Plaintiff must still ultimately establish, at a damages inquest, the amount of damages caused by Arena's actions concerning the transfer agent to a "reasonable certainty."

"'[W]hile a party's default is deemed to constitute a concession of all well pleaded allegations of liability, it is not considered an admission of damages.'"  Bricklayers & Allied Craftworkers Local 2, Albany, N.Y. Pension Fund v. Moulton Masonry & Const., LLC, 779 F.3d 182, 189 (2d Cir. 2015) (quoting Cement & Concrete Workers Dist. Council Welfare Fund v. Metro Found. Contractors, Inc., 699 F.3d 230, 234 (2d Cir. 2012)).  The Court must conduct an inquiry to "ascertain the amount of damages with reasonable certainty." Credit Lyonnais Sec., Inc. v. Alcantara, 183 F.3d 151, 155 (2d Cir. 1999) (citing Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., 109 F.3d 105, 111 (2d Cir. 1997)).  In making this determination, the Court

may rely on affidavits and other documentary evidence, or if necessary, hold a hearing.  See
Cement & Concrete Workers Dist. Council Welfare Fund, 699 F.3d at 234.

For the reasons stated in Section II.D, above, Plaintiff has not established that Arena's
statements in the press releases, which led to the SEC's suspension of trading, constitute tortious
interference.  As a result, for Plaintiff to recover damages, Plaintiff must establish that Arena's
actions concerning the transfer agent caused him to suffer damages.   Thus far, Plaintiff has not
adequately explained how Arena's actions concerning the transfer agent caused it to suffer
$322,000 in damages or any other amount of damages.  Presumably, Plaintiff must ultimately
establish—to a "reasonable certainty"—that Arena's actions concerning the transfer agent—rather
than the delisting—caused it to suffer quantifiable damages.

Plaintiff shall file a written submission on damages by May 10, 2023.  Arena may file a
response by May 31, 2023.  Plaintiff shall file a reply, if any, by June 14, 2023.  **Arena is warned
that failure abide by deadlines set by the Court may result in the Court striking or refusing
to consider any filing.**

### III.  CONCLUSION

For the reasons set forth above, Plaintiff's motion for default judgment is granted in part
and denied in part.  The parties shall follow the briefing schedule set out above for their
submissions on damages.

**SO ORDERED.**

Dated: April 19, 2023
        Central Islip, New York

                        /s/  (JMA)
                        JOAN M. AZRACK
                        UNITED STATES DISTRICT JUDGE